907 A.2d 828

CATTAIL ASSOCIATES, INC.

v.

Leonard SASS, Jr., et al.

No. 849, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Sept. 15, 2006.

476

478

Gregory J. Swain, Annapolis, for Appellant.

John A. Blondell, Glen Burnie, for Appellee.

Panel: HOLLANDER, KENNEY, and BARBERA, JJ.

KENNEY, Judge.

 Appellant, Cattail Associates, Inc., appeals the decision of the Circuit Court for Anne Arundel County granting the motion for judgment of appellees Leonard Sass, Jr. and Beverly Sass ("the Sasses"), Sandra DeVor, and Theresa Sass. Cattail presents one question for our review:

Whether the Circuit Court erred in determining that specific performance of the contract was barred by the Rule Against [Perpetuities][.] [1]

For the following reasons, we shall reverse the circuit court's judgment.

---

1. The Sasses and DeVor ostensibly noted a cross-appeal on June 24, 2005. They present four issues in their brief:
 1. Whether the Trial Court properly Ruled that the Contract is Void under the Rule Against Perpetuities[.]
 2. Whether Cattail Waived any Rights Under the Contract by its Own Inaction[.]
 3. Whether the Claim for Specific Performance was Precluded by Cattail's Own Failure to Fulfill the Contract's Express Contingencies[.]
 4. Whether the Claim for Breach of Contract was Barred by Cattail's Own Failure to Perform and its Failure to Present Evidence of Damages[.]
 " 'It is established as a general principle that only a party aggrieved by a court's judgment may take an appeal and that one may not appeal

## FACTUAL AND PROCEDURAL HISTORY

In February 1995, Cattail entered into a contract with the Sasses, their daughter Sandra Stout,[2] Leonard Sass, Sr.,[3] and Theresa Sass, Leonard Sass, Jr.'s, sister, for the purchase of two parcels of real property located in Anne Arundel County ("the Contract"). The Contract provided for a purchase price of $20,000. An addendum to the Contract included the following provisions:

1. PROPERTY—The Property to be sold and transferred to the Buyer is all of that improved and unimproved real property within the above described two parcels as marked on the attached map, Attachment # 1, together with all the Seller's rights and appurtenances thereto. . . .

\* \* \*

5. SUBDIVISION PROCESS—The Purchaser intends to subdivide the property into a number of single family

---

or cross-appeal from a judgment wholly in his favor.' " *Wolfe v. Anne Arundel County*, 374 Md. 20, 25 n. 2, 821 A.2d 52 (2003) (quoting *Offutt v. Montgomery County Bd. of Education*, 285 Md. 557, 564 n. 4, 404 A.2d 281 (1979)). In this case, the circuit court stated its decision to "grant the motion for judgment and deny the specific performance and all of the other relief sought." Thus, the court's judgment was wholly in favor of the Sasses and DeVor, and, accordingly, they may not appeal or cross-appeal from that judgment. We will, therefore, view the additional questions presented by the Sasses and DeVor as alternative arguments in favor of affirmance.

In her brief, Theresa Sass presents two issues:
1. Whether the Circuit Court erred in granting the motion for judgment made by Appellees at the end of the Appellant's case based upon the theory that the contract was unenforceable due to the Rule against Perpetuities, (the "Rule").
2. Whether there were other reasons at law which support the granting by the Circuit Court of the motion of the Appellees for judgment made at the end of Appellant's case.

We will view these questions as alternative arguments in favor of affirmance.

2. Although she executed the contract as "Sandra Stout," she is a party to this suit as "Sandra DeVor."

3. Leonard Sass, Sr., is deceased. His estate is not a party to this suit.

residential building lots. The Seller hereby grants unto the Purchaser permission to subdivide the Property and further agrees to cooperate with and to support the Purchaser's subdivision efforts including for example signing of plans, plats, applications, covenants, and easements, all at no cost to the seller. The Purchaser will also apply for the site grading permit to cover the construction of the Public Works and Public Utilities improvements; the Seller shall also cooperate and join in this application as well, again at no cost to the Seller. The Settlement of this contract is specifically contingent on the successful completion of the subdivision which shall be evidenced by the obtaining of all the necessary approvals from Anne Arundel County (and any other State and/or Federal Government agency) that are required as discussed in this Paragraph 5. In the event the subdivision does not proceed to conclusion, and settlement fails to take place, then the Purchaser shall provide the Seller upon request, at no cost to Seller, all engineering data, tests, studies, and plats either previously provided to Purchaser or prepared by Purchaser or prepared on behalf of Purchaser with respect to the Property.

6. SETTLEMENT CONTINGENCY—Settlement on this contract is expressly contingent on the prior, or concurrent, settlement of the adjoining property owned by Claire Davison and covered under a separate Contract for Sale of Lots or Acreage dated March 10, 1994. Further, both of the two parcels of the Property under this contract must settle at the same time.

7. SETTLEMENT—Settlement on this contract shall be consummated within Forty-five (45) days after the subdivision is complete, as described in Paragraph 5 above.

\* \* \*

10. PURCHASERS RESPONSIBILITY—The Purchaser shall be solely responsible to pursue the accomplishment of the intended residential subdivision and the obtaining of the requisite approvals in a professional, diligent, and timely manner. . . .

\* \* \*

12. UNFORESEEN EVENTS—If at any time during this contract, an unforeseen event or change should occur ..., which is not the fault of the Purchaser, which the Purchaser determines would make the continuation of the subdivision financially infeasible, then the Purchaser may in writing declare this contract to be null and void and the contract shall be terminated, and all deposits returned within 10 days, and neither party having any further obligation to the other....

\* \* \*

20. TERMINATION—The parties to this contract intend that it will be binding and legally valid upon them. In order to preclude any application of the Rule Against Perpetuities which would otherwise invalidate and nullify this contract, the parties agree that this contract shall expire, unless otherwise previously terminated, on the last day of the time period legally permitted by the Rule Against Perpetuities in the State of Maryland, in which case all deposits shall be promptly returned to the Buyer.

21. SELLER'S WARRANTIES—The persons, both jointly and individually, entering into this contract represent and warrant as follows, unless otherwise specifically indicated in this contract:

(1) That they are the only owners of the Property and that they have the unrestricted right to enter into this contract,

(2) That there are no letters of intent or understanding, contracts of sale, leases, or other similar documents pertaining to the Property, other than this agreement,

(3) That there are no civil or criminal suits, claims, actions, condemnation, liens, or actions pending in any court pertaining to or otherwise affecting this Property, nor does the Seller have any knowledge of any proposed action or claim.

According to Cattail, it made various efforts to pursue its subdivision plan over the ensuing years. In a letter dated July 18, 2000, counsel for Cattail informed the parties that Cattail intended to settle "within the next thirty (30) to forty-five (45) days." The letter also stated that Cattail had determined that Faye Sass, the wife of Leonard Sass, Sr., owned an interest in one of the lots. Because she was not a party to the Contract, Cattail stated that "it will be necessary to obtain her consent in joinder to the Contract." In a letter dated January 2, 2001, and addressed to all the parties to the Contract, counsel for Cattail again stated that Faye Sass, who was not a party to the Contract, owned an interest in the property. The letter stated that counsel had enclosed "an appropriate form" by which she could become a party to the Contract, and requested that the parties "have the document signed and witnessed and returned to our office."

James Muzik, a Cattail principal, testified at trial that the company was "getting very close" to completing its subdivision plan in 2002. He stated: "We wanted to make sure that this property wasn't a thorn in our side. So we decided to settle on that first and get it out of the way." To that end, Cattail informed the Sasses and DeVor in a letter dated December 19, 2002, that it wished to move forward with settlement. The letter stated in its entirety:

I represent Cattail Associates, Inc., with regard to the above referenced contract.

At this time, my client has decided to waive all contingencies set forth in the contract that have not been previously satisfied and proceed to settlement. To that end, the date for settlement is hereby set as Friday, January 3, 2003, at 10:00 a.m. at my office in Annapolis. If you are unavailable on this date and at that time, please let me know at once; otherwise, my client will be present as noted and ready to fulfill its obligations under the contract and proceed with settlement.

You will receive no further notice of the settlement date. Failure to attend settlement will be seen as a breach of your obligations under the contract and my client [will] have no

choice but to take the appropriate action to enforce its rights.

The letter was sent by certified mail, and the three addressees accepted delivery on December 26, 2002.

Cattail's counsel sent a similar letter to Theresa Sass. In a response by telephone, and later by letter, she informed Cattail that she had sold her interest in one of the parcels to the Sasses on October 24, 2002. She stated that the Sasses had agreed to "undertake any and all obligations pursuant to the Contract of Sale, dated February 1995, between the parties and Cattail Associates, Inc." She was of the opinion that she was no longer "involved in this dispute."

Muzik testified at trial that he appeared at counsel's office on December 26, 2002, but neither the Sasses, DeVor, or Theresa Sass attended the scheduled settlement. He also stated that Cattail had not received a response to its letter from the Sasses and DeVor prior to that date.

On March 26, 2003, Cattail brought suit in the Circuit Court for Anne Arundel County against the Sasses, DeVor, and Theresa Sass. In its complaint, Cattail sought specific performance of the Contract. It also brought a breach of contract claim against the Sasses and DeVor, and a negligent misrepresentation claim against Theresa Sass.

The case went to trial on April 22, 2005. At the close of Cattail's case, the Sasses, DeVor, and Theresa Sass moved for judgment. They asserted that the Contract was unenforceable for want of a necessary party, and based on the doctrine of laches. Alternatively, they argued that, if the Contract was enforceable on its face, they could not have settled because the contingencies had not been satisfied. In addition, Theresa Sass argued that she had made only a special warranty, that she had validly assigned her interest in the property, and that Cattail had waived its claims against her.

The defendants also contended that the Contract was unenforceable because it violated the rule against perpetuities. The court agreed. It found that, because the Contract provided for settlement only after certain conditions in the control of

a third party are satisfied, the Contract violates the rule against perpetuities. The court granted the motion for judgment, "deny[ing] the specific performance and all of the other relief sought."

On April 29, 2005, Cattail moved for a new trial, or, in the alternative, to alter or amend judgment. The court denied the motion on May 24, 2005. Cattail noted this appeal on June 15, 2005.

## STANDARD OF REVIEW

■ Pursuant to Maryland Rule 2–519(a), "[a] party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party." Maryland Rule 2–519(b) provides that, "[w]hen a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence." In such a case, we review the circuit court's judgment in accordance with Maryland Rule 8–131(c):

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

See also Boyd v. Bowen, 145 Md.App. 635, 650, 806 A.2d 314 (2002) (stating that "we review the trial court's decision to grant a defendant's motion for judgment at the close of the plaintiff's case in a court trial under Md. Rule 8–131(c)").

■ The clearly erroneous standard does not apply to the circuit court's legal conclusions, however, to which we accord no deference and which we review to determine whether they are legally correct. Cannon v. Cannon, 156 Md.App. 387, 403–404, 846 A.2d 1127 (2004), aff'd, 384 Md. 537, 865 A.2d 563 (2005). "When reviewing a trial court's construction or inter-

pretation of a written contract, we do so as a matter of law." *Nationwide Ins. Cos. v. Rhodes,* 127 Md.App. 231, 235, 732 A.2d 388 (1999).

## DISCUSSION

### I. Validity of the Contract

■ We begin with the argument by the Sasses and DeVor that the Contract is invalid because Faye Sass is not a party to it. In a footnote in their brief they argue: "Even though the failure of Faye's consent is necessary only with respect to the sale of Lot 22, because the Contract deals in all respects with the sale of both Lots 22 and 23 as a unit ... the defect with regard to Lot 22 is fatal to the contract as a whole."

■ It appears that Lot 22 was owned by Leonard Sass, Sr., and Faye Sass, as tenants by the entirety, in a joint tenancy with Theresa Sass. Although Leonard Sass, Sr., signed the Contract in 1995, apparently with the intention of conveying his and Faye's interest to Cattail, Faye was not a party to the Contract. In the case of a tenancy by the entirety, either an absolute divorce or "some form of joint action by the husband and wife is necessary in order to achieve a severance." *Bruce v. Dyer,* 309 Md. 421, 428, 524 A.2d 777 (1987). In the absence of an absolute divorce or some joint act of severance, upon the death of a spouse, the surviving spouse takes the whole through right of survivorship. *Id.; State v. Friedman,* 283 Md. 701, 705, 393 A.2d 1356 (1978). Therefore, the signature of Leonard Sass, Sr., on the contract did not transfer his and Faye's interest in the property. When Leonard Sass, Sr., died in 1997, Faye Sass become the sole owner of their interest in Lot 22.

■ " 'A joint tenant may convey his interest by deed, and the result is a severance of the joint tenancy and the creation of a tenancy in common between the grantee and the surviving joint tenant or tenants.' " *Alexander v. Boyer,* 253 Md. 511, 519, 253 A.2d 359 (1969) (quoting *Eder v. Rothamel,* 202 Md. 189, 95 A.2d 860 (1953) (citing 2 Herbert T. Tiffany &

Basil Jones, *Tiffany Real Property*, § 425 (3rd ed.); and 2 *American Law of Property* § 6.2)). Moreover, "a mere contract by one joint tenant to sell his share, or to settle it, will effect a severance." 2 Herbert T. Tiffany & Basil Jones, *Tiffany Real Property* § 425 (3d ed. Supp.2005) (footnotes omitted). Thus, when Theresa Sass contracted to convey her interest in the property, the joint tenancy was severed, and a tenancy in common with Leonard Sass, Sr. and Faye Sass was created, and after Leonard's death, with Faye Sass alone.

Cattail states that Faye Sass's absence as a party to the Contract "does not matter in this case," because it is merely "asking the Court to order the Appellees to specifically perform the contract as to the portion they can convey, and not any interest that was not contracted for." We are not persuaded that the absence of Faye Sass as a party to the Contract "is fatal to the contract as a whole." Section 1 of the addendum states: "The Property to be sold and transferred to the Buyer is all of that improved and unimproved real property within the above described two parcels . . . together with all the Seller's rights and appurtenances thereto." Accordingly, with respect to Lot 22, Cattail would hold an undivided share as a tenant in common with Faye Sass.

We proceed, then, to Cattail's contention that the circuit court erred in finding that the Contract was void for violation of the rule against perpetuities.

## II. Rule Against Perpetuities

"As a formulation of the Rule Against Perpetuities, our cases have adopted Professor Gray's statement that '[n]o interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.' "[4] *Dorado Ltd. P'Ship v. Broadneck Dev.*

---

4. The statutory modifications to the rule against perpetuities are not relevant to this case. *See* Md.Code (1974, 2001 Repl.Vol.), § 11–102 of the Estates & Trusts Article (exceptions to the rule); Estates & Trusts § 11–103 (application of the rule "to an interest limited to take effect at or after the termination of one or more life estates in, or lives of, persons in being when the period of the rule commences to run").

*Corp.*, 317 Md. 148, 152, 562 A.2d 757 (1989) (quoting *Fitz-patrick v. Mer.-Safe, Etc. Co.*, 220 Md. 534, 541, 155 A.2d 702 (1959)). The rule " 'is not a rule that invalidates interests which last too long, but interests which vest too remotely.' " *Arundel Corp. v. Marie*, 383 Md. 489, 495, 860 A.2d 886 (2004) (quoting *Fitzpatrick*, 220 Md. at 541, 155 A.2d 702).

> By voiding future interests that might vest too remotely, the rule against perpetuities facilitates the alienability of property, helps prevent uncertain title, and encourages owners to make effective use of their property. Historically, the Rule was usually applied to grants or devises made by deed or by will. In recent years, however, [the Court of Appeals] ha[s] extended the Rule to include equitable rights in real property created by contract and enforceable by specific performance.

*Arundel Corp.*, 383 Md. at 495, 860 A.2d 886 (citations omitted).

The Court of Appeals has held that, "if a contract creates an equitable right in real property, enforceable by specific performance, the contract is subject to the Rule." *Dorado*, 317 Md. at 152, 562 A.2d 757. The Court reasoned:

> [W]hen the purpose of a contract is to transfer legal title in land, then legal title must vest within the period of the Rule Against Perpetuities. Otherwise, there would be the distinct possibility that a contract would render title uncertain. After the signing of the contract, the seller retains legal title until the deed is properly executed and delivered. Until that point, the seller's interest is fettered by the possibility that it will be required to relinquish title to the purchaser. Between the signing and execution of the contract, the owner of legal title would be reluctant to make the most effective use of the property....
>
> ... For a land sales contract to be valid under the Rule, therefore, legal title must vest in the purchaser within a life in being plus 21 years.

*Id.* at 153–54, 562 A.2d 757.

To determine whether a conveyance violates the rule against perpetuities, we first construe the language of the

contract apart from any consideration of the rule. *Arundel Corp.*, 383 Md. at 496, 860 A.2d 886. Then we apply the rule to the conveyance to determine whether it could vest too remotely. *Id.*

The Contract places two major contingencies on the ultimate transfer of legal title. Section 5 of the addendum states that "[t]he Settlement of this contract is specifically contingent on the successful completion of the subdivision which shall be evidenced by the obtaining of all the necessary approvals from Anne Arundel County (and any other State and/or Federal Government agency)." Section 6 provides that "[s]ettlement on this contract is expressly contingent on the prior, or concurrent, settlement of the adjoining property owned by Claire Davison and covered under a separate contract for Sale." Thus, under these provisions, settlement will not occur until Cattail receives the necessary government approvals for its subdivision plan, and the sale of an adjacent parcel is settled.

The rule against perpetuities requires that the interest to be conveyed " '*must* vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.' " *Dorado*, 317 Md. at 152, 562 A.2d 757 (quoting *Fitzpatrick*, 220 Md. at 541, 155 A.2d 702) (emphasis added). "The Rule is applied to determine whether the interest could vest beyond the permissible period, based on the *possibility* of events, not *actual* events." *Arundel Corp.*, 383 Md. at 496, 860 A.2d 886. "A future interest is invalid unless it is absolutely certain that it must vest within the period of perpetuities. Probability of vesting, however great, is not sufficient." W. Barton Leach, *Perpetuities in a Nutshell*, 51 Harv. L.Rev. 638, 642 (1937). *See also* Tiffany, *supra*, at § 395.

In *Dorado*, Broadneck Development Corp. agreed to sell 112 lots to Dorado L.P. Settlement was contingent on Broadneck's obtaining "sewer allocations" from the county. *Dorado*, 317 Md. at 150, 562 A.2d 757. When, due to a government moratorium on sewer allocations, the sale had not been com-

pleted, Dorado brought a declaratory judgment action. *Id.* at 151, 562 A.2d 757.

The Court of Appeals stated that it was "immaterial" that Dorado had obtained equitable title by execution of the contract. *Id.* at 156, 562 A.2d 757. "If legal title might not vest within a life in being and 21 years, then the contract is invalid under the Rule Against Perpetuities." *Id.* The Court therefore concluded that the contract was unenforceable because it violated the rule:

> Settlement is contingent upon a county sewer allocation. It is uncertain when, if ever, Broadneck will obtain the sewer allocation. It is conceivable that it could occur after a life in being plus 21 years. . . .

\* \* \*

In this case, Broadneck has fulfilled its obligation under the contract. It has applied for a sewer allocation. Settlement is dependent, not on performance by Broadneck, but on the action of a third party, Anne Arundel County. Whether Anne Arundel County might grant a sewer allocation for the lots within the perpetuities period is unknown. *Id.* at 156, 158–59, 562 A.2d 757.

Cattail directs us to a line of our cases in which a conveyance that would otherwise have violated the rule against perpetuities was found to include an express or implied time limitation, saving the conveyance from running afoul of the rule. In *Stewart v. Tuli,* 82 Md.App. 726, 573 A.2d 109 (1990), settlement on a sales contract was contingent on the seller's obtaining clear title because there was some question with regard to the enforceability of a prior sales contract. We distinguished *Dorado* by determining that the contract contained a reasonable time limitation.

In *Hays v. Coe,* 88 Md.App. 491, 504, 595 A.2d 484 (1991), *vacated by* 328 Md. 350, 614 A.2d 576 (1992), we addressed a land sales contract provision extending the contract " 'until a good and marketable title can be transferred.' " We determined that, "even without an express contractual directive

that action to clear title 'must be taken promptly,' we believe that the *Stewart* rationale is applicable, and the addendum here does not violate the rule against perpetuities." *Id.* at 505, 595 A.2d 484. In vacating our decision,[5] the Court of Appeals stated, without explanation: "The Court of Special Appeals construed the [trial court's] reference to a cloud on title as a ruling that the Rule Against Perpetuities had been violated. It correctly rejected that as a viable holding." *Hays*, 328 Md. at 362, 614 A.2d 576.

*Brown v. Parran*, 120 Md.App. 653, 656, 708 A.2d 12 (1998), involved a sales contract that was contingent on "percolation tests" and "permits approvals." Despite the fact that these contingencies were in the control of Calvert County, we held that they did not cause the conveyance to violate the rule against perpetuities. We distinguished *Dorado* on the basis that, in that case, there was a moratorium on sewer allocations, and instead relied on our holding in *Stewart*. *Id.* at 661, 663, 708 A.2d 12.

In *Kobrine, L.L.C. v. Metzger*, 151 Md.App. 260, 824 A.2d 1031 (2003), *vacated by* 380 Md. 620, 846 A.2d 403 (2004), we addressed a covenant by a developer to convey certain real property to the landowners in a subdivision, for use as a common area, once all the lots were sold. Relying on our reasoning in *Brown*, we determined that the rule against perpetuities would not be violated. We also stated that, "[e]ven if the Rule Against Perpetuities might otherwise apply to the agreement to convey contained in the Declaration in this case, we believe the developer's intention would mandate not applying the rule." *Id.* at 287, 824 A.2d 1031.

The Court of Appeals vacated our decision, holding that the developer had made no such covenant. *Kobrine*, 380 Md. 620, 846 A.2d 403. That holding made it "unnecessary for [the

---

5. This case also involved a dispute over the proper interpretation of a will. The Court of Appeals vacated our decision, and remanded to the circuit court for "further explanation" regarding the circuit court's finding that a "cloud on title" precluded application of the doctrine of equitable conversion. *Coe*, 328 Md. at 362–63, 614 A.2d 576.

Court] to consider whether, if such a covenant existed, it would have violated the Rule Against Perpetuities." *Id.* at 634, 846 A.2d 403. In a footnote, the Court stated: "In declining to comment on whether, if § 5 did constitute a covenant to convey, it would violate the Rule Against Perpetuities, we should not be regarded as approving in any way the notion of the Court of Special Appeals that, if the rule *did* apply, 'the developer's intention would mandate not applying the rule.' " *Id.* at 634 n. 4, 846 A.2d 403 (quoting *Kobrine*, 151 Md.App. at 287, 824 A.2d 1031).

We are not persuaded that, absent the "savings provision" to be discussed below, the contract would satisfy the rule against perpetuities. The Court of Appeals in *Dorado* rejected the notion that an implied limitation of a reasonable time should be recognized, even though the contract at issue made time of the essence. The Court stated: "[W]here the occurrence of the condition precedent to conveyance is beyond the control of the parties, a reasonable time for performance, less than the perpetuities period, cannot be implied." *Id.* at 158, 562 A.2d 757.

Here, the granting of the necessary approvals is within the control of Anne Arundel County and possibly other government agencies. It cannot be known with any certainty if and when settlement will take place. Subject to the "savings" provision of section 20 of the addendum, it cannot be said that title to the real property to be transferred to Cattail " 'must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.' " *Dorado*, 317 Md. at 152, 562 A.2d 757 (quoting *Fitzpatrick*, 220 Md. at 541, 155 A.2d 702).

We turn, then, to section 20 of the addendum, which states:

The parties to this contract intend that it will be binding and legally valid upon them. In order to preclude any application of the Rule Against Perpetuities which would otherwise invalidate and nullify this contract, the parties agree that this contract shall expire, unless otherwise previ-

ously terminated, on the last day of the time period legally permitted by the Rule Against Perpetuities in the State of Maryland, in which case all deposits shall be promptly returned to the Buyer.

Drafters have long used a "savings clause" to avoid violations of the rule against perpetuities. *See, e.g.,* 61 Am.Jur.2d, *Perpetuities & Restraints on Alienation* § 25 (Supp.2006); David M. Becker, *If You Think You No Longer Need to Know Anything About the Rule Against Perpetuities, Then Read This!,* 74 Wash. U. L.Q. 713, 735–40 (1996); W. Barton Leach, *Perpetuities: The Nutshell Revisited,* 78 Harv. L.Rev. 973, 985–86 (1965); W. Barton Leach & James K. Logan, *Perpetuities: A Standard Saving Clause to Avoid Violations of the Rule,* 74 Harv. L.Rev. 1141 (1961). Courts generally find savings clauses to be effective in avoiding the rule.[6] *See, e.g., Fitchie v. Brown,* 211 U.S. 321, 323, 29 S.Ct. 106, 53 L.Ed. 202 (1908); *Klugh v. United States,* 588 F.2d 45 (4th Cir.1978); *In re Burrough's Estate,* 521 F.2d 277 (D.C.Cir.1975); *First Alabama Bank of Montgomery v. Adams,* 382 So.2d 1104 (Ala.1980); *Smith v. Smith,* 747 A.2d 85 (Del.Ch.1999), *aff'd,* 744 A.2d 988 (Del.1999); *Norton v. Georgia R.R. Bank & Trust,* 253 Ga. 596, 322 S.E.2d 870 (1984); *First Nat. Bank of Joliet v. Hampson,* 88 Ill.App.3d 1057, 44 Ill.Dec. 17, 410 N.E.2d 1109 (1980). *But see Hagemann v. Nat. Bank & Trust Co.,* 218 Va. 333, 237 S.E.2d 388 (1977) (holding that a savings clause that by its terms adopts the provisions of the conveyance that run afoul of the rule against perpetuities is itself violative of the rule).

 With regard to the savings clause now before us, it was discussed at oral argument whether it is effective because neither a measuring life nor a termination date are specified in the Contract. In a perpetuities analysis, a measuring life

---

6. The only Maryland case we have located involving a perpetuities savings provision is *Arrowsmith v. Mercantile–Safe Deposit & Trust Co.,* 313 Md. 334, 545 A.2d 674 (1988), a case in which the Court of Appeals declined to apply the doctrine of dependent relative revocation in such a way as to insert a savings clause from a revoked will into a later will that violated the rule against perpetuities.

need not be identified in the instrument, "and need not be connected in any way with the property or the persons designated to take it." Leach, *supra,* 51 Harv. L.Rev. at 641. *Accord* John Chipman Gray, *The Rule Against Perpetuities* §§ 216, 219.2, at 217, 222–23 (Ronald Gray ed., 4th ed.1942). Indeed, it "may be selected at random." 6 *American Law of Property* § 24.13, at 47 (A. James Casner ed., 1952). "It is sufficient that there are living persons within twenty-one years of the death of whom (plus periods of gestation) the interest must vest, if at all." *Id.* at 48.

■■ The measuring life must, however, be a natural life. The Court of Appeals has said: "Corporations . . . cannot be used as measuring lives for purposes of the Rule Against Perpetuities." *Ferrero Const. Co. v. Dennis Rourke Corp.,* 311 Md. 560, 576 n. 7, 536 A.2d 1137 (1988) (citing *Fitchie,* 211 U.S. at 334, 29 S.Ct. 106).

Where the transferring instrument does not identify the measuring life, courts have looked to "those persons implied by the creating instrument, necessarily involved in the limitations therein, or . . . who can affect the vesting of the interest." *Matter of Estate of Anderson,* 541 So.2d 423, 430 (Miss.1989). *See also Betchard v. Iverson,* 35 Wash.2d 344, 212 P.2d 783, 789 (1950); Restatement (Second) of Property, Donative Transfers § 1.3, comment b; Gray, *supra,* § 219.2, at 222–23.

In *Fitchie,* the Supreme Court of the United States considered a will provision that stated: " 'The balance, residue, or remainder of my estate is to be placed in trust for as long a period as is legally possible, the termination or ending of said trust to take place when the law requires it under the statute.' " John Chipman Gray and Ronald Gray, author and editor respectively of the seminal work on perpetuities,[7] argued before the Court that the savings clause effectively avoided the rule against perpetuities. The Court agreed. The Court noted that the testator had not selected the lives in

---

7. *See* Gray, *supra.*

being, but found it implied in the will that the beneficiaries should be the measuring lives:

> [I]f the scheme of the will, discoverable from its provisions, be such that a plain implication arises from those provisions that a certain class or number of lives mentioned, or referred to, in the will, were selected by the testator for a limitation of the trust, such implied selection is sufficient. It is the intention of the testator that is to be sought, and such intention is not always found to have been directly, and in so many words, expressed in the will. . . .

> \* \* \*

> . . . When the testator created the trust in the language already quoted he must have intended it should be measured by some lives then in being, and for not more than twenty-one years thereafter; because that is the longest time a trust of that kind is legally possible, and he provided it should last as long as that. There are no other lives that can reasonably be said to have been within the intention of the testator when he was making this provision. . . .

> \* \* \*

> Upon all these considerations, the inference, we think, is very strong that the lives selected were the lives of the annuitants. A reading of the will fails to suggest any other set of lives that the testator could reasonably be supposed to have intended. . . .

*Id.* at 330–31, 29 S.Ct. 106.[8]

As to the validity of the trust, the Court held:

---

**8.** Gray cautioned that there is a difference between ascertaining the "lives of persons, in the description of the event on which the gift is to vest, and reference by a court, in passing on the validity of the gift, to lives of persons as a measure in the application of the Rule against Perpetuities." Gray, *supra*, § 219.2, 222–23 n. 2. The testator's intent may be relevant to the issue of when the gift vests, but is generally irrelevant to the discrete issue of whether the transfer violates the rule against perpetuities:

The whole of the language of the will must be considered, and while it says the trust is to continue as long as it is legally possible, it must also be remembered that a distribution of the whole estate is to be made, and therefore . . . the trust is to continue as long as is legally possible and as shall be consistent with making the distribution as directed by the will. This distribution must be made at a time which is not too remote,—that is, a time within which the trust would be valid,—for the testator provided that the trust should only last that long. Payments of most of the annuities are to be continued to the heirs of the annuitants, but we think these payments are to stop with the death of the last survivor of the annuitants named in the list and twenty-one years thereafter. The distribution of the entire corpus of the fund remaining with the trustee is then to be made as provided for in the will.

*Id.* at 332, 29 S.Ct. 106.

In *Smith v. Smith*, 747 A.2d 85, 87 (Del.Ch.1999), *aff'd*, 744 A.2d 988 (Del.1999), the Chancery Court of Delaware addressed a deed signed by former spouses that gave the husband and " 'his heirs and assigns' " a right of first refusal should the wife, " 'or her estate ("estate" to include her heirs or devisees) . . . decide to sell or gift' " the property. Recognizing a perpetuities issue, the parties included a savings clause:

> Where the first kind of reference is involved, the question is what was the testator's intent, and whether it is expressed with sufficient certainty. But in every case, after the intent has been ascertained, the question remains whether the gift is valid under the Rule against Perpetuities. The testator's intention does not necessarily play any part here; often he did not have the Rule in mind. In deciding this question, reference must be made by the Court to lives by which to measure the period allowed by the Rule. For the purpose of sustaining a limitation, reference may be made by the Court to the lives of any persons living at the testator's death, whose lives have a necessary relation to the event on which the limitation vests, whether or not those persons take any interest in the property or are mentioned in the will.

*Id.* (citations omitted).

"In the event that any of the reservations or restrictions contained herein should result in a violation of the rule against perpetuities if enforced, then such reservation or restriction shall be deemed and construed only to extend and apply to those persons or classes who may be lawfully restricted in the selling or gifting of all or a portion of the herein-described real property without violating the aforesaid rule."

*Id.* at 88.

The court stated that, "if the parties' intended life in being can be discerned from the document, even if not expressly named as such, their intent should be honored." *Id.* at 91. The court determined that "clearly the parties contemplated that this deed would bind [the wife] and her estate." *Id.* Thus, the wife was deemed to be a life in being, but not her estate because it did not exist at the time of execution. Likewise, the court determined that the husband was a suitable measuring life, and concluded that the option was good until "21 years after the death of the later of [the wife] and [the husband]." *Id.* at 92.

Commentators are in accord with *Fitchie* and *Smith:*

Not infrequently a testator directs that property be held in trust "for my children and their descendants, as long as the law allows" or similar verbiage. At first blush it would seem such provisions must fail for uncertainty if for nothing else, for the law would allow the property to be tied up for the lives of his children, or all his first cousins, or for the lives of any reasonable number of babies selected at random. Which is to be taken? Courts have given such wording a practical construction and held that it means for the lives of the prime beneficiaries (the children in the case suggested), and twenty-one years thereafter, and sustained the gift.

Casner, *supra,* § 24.13, at 49 (citing *Fitchie* and Gray, *supra* ).

Considering the Contract as a whole and the express recognition of the perpetuities issue as reflected by the "savings" provision, extending to "the last day of the time period legally

permitted by the Rule Against Perpetuities," the clear implication is that the sellers as a class should be considered the measuring lives. To extend to the last day "legally permitted," the title to the Property must vest, if at all, prior to the passing of the last surviving seller, plus twenty-one years. We therefore hold that, by virtue of the savings clause, the rule against perpetuities is not violated.

## III. Waiver of Conditions

The Sasses and DeVor urge, as an alternative ground for affirmance, that, even if the rule against perpetuities is not violated, their performance is not due because the conditions precedent have not been satisfied, and therefore they are not in breach of the Contract. Cattail responds that it validly waived the conditions to performance.

Generally, a party seeking specific performance must "be able to show that he has fully, not partially, performed everything required to be done on his part." *Clayten v. Proutt*, 227 Md. 198, 203, 175 A.2d 757 (1961). Indeed, "[t]he performance of all conditions precedent is generally required before specific performance will be granted." 25 Samuel Williston, *A Treatise on the Law of Contracts* § 67:73 (Richard A. Lord ed., 4th ed.1992, Supp.2006).

Nevertheless, "[a] party to a contract may waive a right under the contract[.]" *Brendsel v. Winchester Const. Co.*, 162 Md.App. 558, 573, 875 A.2d 789 (2005), *aff'd*, 392 Md. 601, 898 A.2d 472 (2006). "[E]ither party to a contract may waive any of the provisions made for his benefit." *Twining v. Nat'l Mortgage Co.*, 268 Md. 549, 555, 302 A.2d 604 (1973). *Accord Barnes v. Euster*, 240 Md. 603, 214 A.2d 807 (1965); *Giardina v. Farms Co.*, 25 Md.App. 201, 208, 333 A.2d 366 (1975); Williston, *supra*, at § 39:17 (stating that "[i]t is well established that a party to a contract may waive a condition precedent to his or her own performance of a contractual duty," and that "the contract remains enforceable despite the nonoccurrence of the condition"). "Waiver, however, 'must be clearly established and will not be inferred from equivocal acts

or language. Whether there has been a waiver of a contractual right involves a matter of intent that ordinarily turns on the factual circumstances of each case.'" *Questar Homes of Avalon, LLC v. Pillar Const., Inc.*, 388 Md. 675, 687, 882 A.2d 288 (2005) (quoting *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 109, 468 A.2d 91 (1983)). As recently stated by one court, "[i]t is well established that although a party may waive a provision included in a contract for that party's sole benefit, a party cannot waive a contractual requirement that benefits both sides to the transaction." *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 371 F.Supp.2d 510, 520 (S.D.N.Y.2005).

> Accordingly, the application of the doctrine of waiver when one party seeks to enforce a contract and compel performance by the other party despite the nonoccurrence of a condition precedent to performance, ordinarily requires a determination whether the condition was inserted in the contract solely for the benefit of the party seeking to enforce the contract despite its nonoccurrence.

Williston, *supra*, at § 39:24.

The circuit court determined that the Contract was invalid *ab initio* for violation of the rule against perpetuities. It noted that Cattail had expressed a willingness to waive the conditions, but made no findings with respect to whether the conditions could be waived by Cattail alone, and, if so, whether they had been validly waived by it. Consequently, we decline to consider the issue as an alternative ground for affirmance. It is a consideration for the circuit court on remand.

## IV. Laches

The Sasses and DeVor also argue that we should affirm the circuit court's judgment because Cattail's delay in seeking settlement precludes specific performance. In response, Cattail argues that it diligently sought to meet the necessary contingencies, and did not unduly delay settlement.

 In *Archway Motors, Inc. v. Herman*, 37 Md.App. 674, 681, 378 A.2d 720 (1977), we explained: "Specific performance is considered an extraordinary equitable remedy which

may be granted, in the discretion of the chancellor, where more traditional remedies, such as damages, are either unavailable or inadequate." Moreover, "[t]his extraordinary remedy has been particularly recognized as appropriate where the contract is for the sale of land because of the presumed uniqueness of land itself, no parcel being exactly like another." *Id.*

> The questions of whether specific performance of a contract relating to the ownership and use of land shall be decreed and what shall be the terms of the decree rest within the sound discretion of the equity court. The exercise of the court's discretion, however, must not be arbitrary and is controlled by established principles of equity. Where a contract for the sale of real estate is fair, reasonable and certain in all of the terms, it is as much the duty of a court of equity to decree specific performance as it is for a court of law to award damages for breach of contract.

*Boyd v. Mercantile–Safe Deposit & Trust Co.*, 28 Md.App. 18, 22, 344 A.2d 148 (1975).

 On the other hand, "a court of equity will not enforce a contract specifically when the purchaser has delayed many years before seeking to enforce it, especially when the property has greatly increased in value, or there are circumstances which would make such a decree inequitable." *Soehnlein v. Pumphrey*, 183 Md. 334, 339, 37 A.2d 843 (1944). *Accord Sealock v. Hackley*, 186 Md. 49, 53, 45 A.2d 744 (1946). *See also* Williston, *supra*, at § 67:20 (stating that, "[i]f the plaintiff was in default or guilty of gross laches, and the value of the property had materially changed, specific performance may be and generally is denied").

 In determining whether the remedy of specific performance is precluded on the basis of laches, the trial court "must decide the question from all the facts and circumstances in each particular case." *Boyd*, 28 Md.App. at 26, 344 A.2d 148. "Prejudice or injury to the party raising laches is an essential element," and, by the same token, where "the posi-

tion of the parties is not changed and there is no prejudice from the delay, laches is inapplicable." *Id.*

The circuit court noted that the evidence presented at trial indicated that, after entering into the Contract, Cattail diligently pursued its subdivision plan and attempted to meet the conditions to settlement. Because the court concluded, however, that the Contract was unenforceable for violation of the rule against perpetuities, it made no findings with respect to any prejudice or injury to the sellers as a result of Cattail's delay in seeking specific performance. Consequently, we decline to affirm the court's judgment on this alternative ground. The court may consider it on remand.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED.**

**COSTS TO BE PAID BY APPELLEES.**